## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

**QUANTEL ROLLE, M.D.,**

Plaintiff,

v.

**RIVERSIDE MEDICAL GROUP, d/b/a RIVERSIDE MEDICAL CENTER,** an Illinois not for profit corporation, **KYLE BENOIT**, individually, and **PHILLIP M. KAMBIC**, individually,

Defendants.

No.   22-cv-2187

## **COMPLAINT**

Plaintiff Quantel Rolle, M.D. ("Dr. Rolle") brings this action against Defendants Riverside Medical Group d/b/a Riverside Medical Center ("RMG"), Kyle Benoit ("Benoit"), and Phillip M. Kambic ("Kambic") under Section 1981 of the Civil Rights Act of 1870 (42 U.S.C. § 1981) ("Section 1981"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq.* ("IHRA"), the Illinois Whistleblower Act ("IWA") and the Illinois Wage Payment Collection Act, 820 ILCS 115/1 *et seq.* ("IWPCA"). Dr. Rolle, an African American man, is a brilliant trauma and acute care surgeon who endured a hostile work environment at Riverside Medical Center. He was wrongfully terminated after he refused to provide substandard medical care to patients. In terminating Dr. Rolle's employment, RMG discriminated against him based on his race, breached his contracts, breached the covenant of good faith and fair dealing, and retaliated against him in violation of a public policy. RMG, its Chief Operating Officer, Kyle Benoit, and its former President and CEO, Phillip M. Kambic, then refused to pay Dr. Rolle's outstanding wages in violation of the IWPCA.

## **NATURE OF THE ACTION**

1.      Dr. Rolle brings claims for race discrimination in violation of Section 1981, Title VII, and the IHRA against Defendant RMG.

2.      Dr. Rolle brings claims for violation of the IWPCA against all Defendants.

3.      Dr. Rolle brings claims for breach of contract, breach of the covenant of good faith and fair dealing, wrongful discharge, tortious interference with economic advantage in addition to violation of Section 1981, Title VII, the IHRA, and the IWPCA against Defendant RMG.

## **JURISDICTION AND VENUE**

4.      Plaintiff's claims arise under Section 1981 and Title VII, thereby he invokes federal jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), and 42 U.S.C. § 1988.

5.      This Court may exercise supplemental jurisdiction over Plaintiff's common law and Illinois statutory claims under 28 U.S.C. § 1367.

6.      Venue is proper under 28 U.S.C. §§ 1391(b) because the unlawful conduct complained of herein occurred within this judicial district.

7.      Dr. Rolle filed a race discrimination and harassment charge with the Illinois Department of Human Rights ("IDHR") and Equal Employment Opportunity Commission ("EEOC") on November 23, 2021 and received the IDHR's notice of dismissal on June 1, 2022.

8.      Dr. Rolle requested that the EEOC adopt the findings of the IDHR and issue a right to sue on June 23, 2022.

9.      EEOC issued Dr. Rolle a Notice of Right to Sue on July 27, 2022.

## **THE PARTIES**

10.     Dr. Rolle is a board-certified surgeon specializing in general surgery and trauma.

11.     At all times he was an "employee" within the meaning of Title VII, the IHRA, and the IWPCA.

12.     RMG is an Illinois not-for-profit corporation that is comprised of multiple entities and facilities, including Riverside Medical Center and Riverside Miller Rehabilitation. It provides inpatient and outpatient medical care to individuals in Kankakee, Iroquois, Will, and Grundy counties.

13.     RMG is a citizen of Illinois and is headquartered at 350 N. Wall Street, Kankakee, Illinois.

14.     At all times RMG was an "employer" within the meaning of Title VII, the IHRA, and the IWPCA.

15.     Benoit is the Chief Operating Officer of RMG. He is a citizen of Bourbonnais, Illinois.

16.     Kambic was the president and CEO of RMG during Dr. Rolle's employment. He is a citizen of Bourbonnais, Illinois.

### FACTS RELEVANT TO ALL CLAIMS

17.     Dr. Rolle, an African American man, received his doctorate in medicine from the University of Tennessee Health Science Center, where he completed his internship in surgery. He worked at Atrium Health in Charlotte, North Carolina, for three years, serving as chief resident of general surgery.

18.     RMG recruited Dr. Rolle to work as a general and trauma surgeon at Riverside Medical Center, a 300-bed hospital located in Kankakee, Illinois.

19.     Dr. Rolle signed an Employment Agreement with RMG on January 2, 2019 for a term of 36 months. *See* Ex. A (Employment Agreement).

20.     Under its terms, Dr. Rolle was entitled to a base salary as well as incentive pay and reimbursement of various expenses. *Id.* at 14.

21.     In signing the Employment Agreement, Dr. Rolle agreed to treat and diagnose patients "consistent with the applicable standard of care." *Id.* § 2.

22.     Dr. Rolle also signed a Trauma Surgery Call Services Agreement ("TSCS Agreement") on December 3, 2019, that entitled him to additional compensation. Ex. B (TSCS Agreement) at 9.

23.     He began work at Riverside Medical Center on December 3, 2019, after he received licensure from the Illinois Department of Public Health ("IDPH").

24.     Throughout his tenure at RMG, Dr. Rolle never once received a disciplinary action, malpractice claim, or medical board review.

25.     Dr. Rolle performed his contractual duty seriously, providing quality care to his patients based on national, evidence-based guidelines and focusing on his patients' health and well-being at all times. Dr. Rolle's dedication and commitment to following the standard of care led to improved outcomes, especially in trauma care.

**Discrimination and Harassment During Employment**

26.     While employed by RMG, Dr. Rolle reported to Dr. Paul Rowland, a white male.

27.     Dr. Rolle had been warned Dr. Rowland was "a little antiquated."

28.     Dr. Rowland's frequent racist and sexist statements in the workplace were common knowledge but went unchecked by leadership.

29.     For example, on one occasion, in Dr. Rolle's presence and that of some female colleagues, Dr. Rowland stated that "potential female first-assists need to wear high heels" and proceeded to physically imitate a woman walking in high heels.

30.     Dr. Rowland frequently made inappropriate statements to Dr. Rolle which referenced race. For example, when discussing another physician's wife, Dr. Rowland described her to Dr. Rolle as being "black as spades, but still pretty."

31.     On or about June 30, 2020, near the operating room, Dr. Rowland learned that that Dr. Rolle's daughter, who was born prematurely, was hospitalized in the ICU, intubated and receiving therapy. Dr. Rowland commented that Dr. Rolle should not worry about her, and that he was "sure your daughter will be home eating ribs before you know it."[1]

32.     Dr. Rolle was deeply upset, embarrassed and disturbed at his comment, which not only made light of his newborn daughter's very serious medical condition but perpetuated dehumanizing racist tropes.

33.     Dr. Rolle's work performance was also far more scrutinized than his non-African American colleagues' work, and upon information and belief, his medical performance was discussed at RMG's mortality and morbidity meetings with much greater frequency than that of his non-African American peers.

34.     Dr. Rolle had nowhere to report the hostile work environment, because presumably the racism came from the top, or was, at best, permitted to fester with impunity.

35.     RMG had no office of Diversity, Equity, and Inclusion or Equal Employment Opportunity, despite that there were both obvious and serious deficiencies in the inclusivity of the working environment at RMG, as well as outright racial hostility at times.

36.     For example, during an event to promote racial equity in healthcare, an ER physician employed by RMG taped a picture of an 18th century enslaved Afro-Brazilian woman

---

[1] Dr. Rowland admitted to these statements in the Fact Finding Conference conducted by the IDHR.

imprisoned in an iron face mask and a neck shackle to the ER break room wall with a racially charged message.

### Dr. Rolle Raised Concerns About RMG's Deviation from Recognized Standards of Care and Potential Medicare Fraud

37.　　After working at RMG for a short time, Dr. Rolle observed numerous instances in which RMG's physicians deviated from nationally recognized standards of care.

38.　　Dr. Rolle made repeated complaints internally about RMG's failure to uphold these standards of care.

39.　　For example, after Dr. Rolle learned of another doctor's common practice of sending breast-conserving therapy surgical patients to nuclear radiology for injection and nuclear lymph node scanning, he informed the physicians that such scans were both painful and outside the national guidelines because they were unnecessary.

40.　　Dr. Rolle was reprimanded by Keith Moss, the Chief Medical Officer, for encouraging his patient to decline the scan. Dr. Rolle was told "this is how we do it."

41.　　RMG profits handsomely from payments for nuclear lymph node scans for Medicare and Medicaid patients paid by the Centers for Medicare and Medicaid Services ("CMS") and/or Illinois Department of Healthcare and Family Services ("IDHS").

42.　　CMS does not pay for items or services which are not reasonable and necessary for the diagnosis or treatment of illnesses. 42 U.S.C. § 1395y(a)(1)(A).

43.　　Dr. Rolle asked management why the ICU did not have a board-certified intensivist staffed full-time to provide special care for critically ill patients. He noted that the lack of adequate staffing was causing poor outcomes, including fatalities, for RMG's critically ill patient population.

44.     At a January 2021 morbidity and mortality meeting, Dr. Rolle gave a PowerPoint presentation and used a specific model to support his decisions and implementation of care practices. When he attempted to file the PowerPoint electronically with RMG, Theresa Alberico, of the Quality Improvement department, told him to print it instead, "so that attorneys would be unable to discover it through email."

45.     When non-African American colleagues raised concerns, they were generally better received and addressed promptly by RMG.

46.     RMG did nothing to rectify these issues raised by Dr. Rolle because of his race.

### Termination of Dr. Rolle's Employment

47.     On January 19, 2021, Jeffrey Coto, the operations director of surgical service line and wound centers at Riverside, recommended Dr. Rolle provide wound care services at Riverside Miller Rehabilitation Center ("Miller") a skilled nursing facility that receives CMS reimbursement for providing care to Medicare and Medicaid patients.

48.     Dr. Rolle is not certified in wound care and told Coto that he was not qualified.

49.     RMG informed Dr. Rolle that no one on Miller's staff, including the wound-care nurse, had received a certification in wound care.

50.     CMS requires that "wound care must be performed in accordance with accepted standards for medical and surgical treatment of wounds." Local Coverage Determination L37166.

51.     Illinois law prohibits providing substandard wound care to residents of skilled nursing facilities like Miller. 77 Ill. Admin. Code § 300.3240.

52.     Inpatient wound care provider, Shambree Chambers, NP, informed Dr. Rolle that RMG had declined to hire a qualified wound-care nurse practitioner with interest in the position.

53.     On or about January 20, 2021, Dr. Rolle declined the Miller assignment because it would not be in the best interest of Miller's patients for him to accept the role without proper certification and the lack of certified wound care onsite, and he worried about the negative impact of his reduced availability on his current patients.

54.     The following day, Coto cornered Dr. Rolle in his office to pressure him into accepting the Miller position. Dr. Rolle again expressed his concerns that Miller lacked qualified wound care nursing and had no viable pathway for one.

55.     In response to Coto's continued pressure, Dr. Rolle offered to see Miller's patients at Riverside, where Dr. Rolle would be better able to care for them given the access to certified wound care nurses, hospital admissions, and facilities to perform operative surgical wound debridement as needed.

56.     Coto rejected Dr. Rolle's offer because Miller patients seeing providers offsite would reduce Miller's daily CMS reimbursement.

57.     After Dr. Rolle refused to endanger patients for the sake of profit, Coto threatened to tell the VP of Human Resources about Dr. Rolle's decision.

58.     Dr. Rolle requested that Coto indeed share the information with the VP of Human Resources, and to also convey his reasoning regarding his lack of would care qualifications and Miller's lack of adequate wound care staff.

59.     Coto then asked Dr. Rolle about his efforts at building a patient referral base, told Dr. Rolle he was "banking" on him to accept the assignment, and walked out.

60.     Eleven days later, on February 1, 2021, RMG terminated Dr. Rolle's contract "without cause," effective May 1, 2021.

61.     Dr. Rolle was only 14 months into his 36-month contract.

62.     No other non-African American physicians have been terminated with or without cause because they refused an assignment for which they were unqualified.

63.     Dr. Rolle notified RMG that he was owed payment for trauma services rendered, for missing incentive compensation, and unreimbursed expenses related to his Advanced Trauma Life Support (ATLS) certification.

64.     Dr. Rolle received his Trauma Call compensation for March or April 2021 several months after it was due and owing under the TCSC Agreement.

65.     RMG wholly refused to pay Dr. Rolle's incentive compensation, as well as expenses related to his ATLS certification.

### RMG Interferes with Dr. Rolle's Career

66.     On February 16, 2021, Dr. Rolle received an offer from Ingalls Memorial Hospital in Harvey, Illinois.

67.     Two days later, the assignment was cancelled because RMG refused to provide references and verification of qualifications to Ingalls.

68.     On February 22, 2021, Dr. Rolle's recruiter confirmed that it could no longer assist him in his search for employment because he was unable to attain references and verifications from RMG.

69.     RMG actively and intentionally prevented Dr. Rolle from attaining gainful employment by withholding the necessary references and verifications.

70.     Because of Defendants' tortious interference, Dr. Rolle has suffered injuries including lost wages, benefits, harm to professional standing and reputation, and emotional distress.

## COUNT I:
## RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981
### (against Defendant RMG)

71.     Plaintiff realleges and incorporates by reference all the allegations above as though fully stated herein.

72.     Section 1981 prohibits discrimination within a contractual relationship based upon an employee's race. 42 U.S.C. § 1981.

73.     RMG violated Section 1981 by subjecting Dr. Rolle to unequal treatment based on his race. Specifically, RMG demonstrated racial animus towards Dr. Rolle by allowing a work environment where known racism and sexism were tolerated, dismissing Dr. Rolle's concerns regarding RMG's deviation from recognized standards of care, and terminating his contract early without cause.

74.     RMG violated Section 1981 by denying Dr. Rolle the benefits, privileges, and terms of his employment relationship as a physician when it terminated his contract without cause.

75.     RMG further violated Section 1981 by refusing to provide prospective employers with Dr. Rolle's necessary verifications and references.

76.     RMG's conduct was intentional, deliberate, reckless, willful and conducted with disregard the rights of Dr. Rolle.

77.     As the direct and proximate result of the RMG's violations of Section 1981, Dr. Rolle has suffered substantial damages, including, without limitation, inability to obtain full reemployment for over a year.

78.     By reason of RMG's discriminatory practices, the Dr. Rolle has experienced hardship, including loss of wages and other employment benefits, decreased earning potential, loss

of professional standing, emotional distress, and he is entitled to all legal and equitable remedies under Section 1981 as amended, including compensatory and exemplary damages.

## COUNT II:
## RACE DISCRIMINATION IN VIOLATION OF TITLE VII
### (against Defendant RMG)

79.     Plaintiff realleges and incorporates by reference all the allegations above as though fully stated herein.

80.     Title VII, as amended, prohibits employers from subjecting their employees to discrimination with respect to terms, conditions, benefits, or privileges of employment based on race. 42 U.S.C. § 2000e-2(a)(1).

81.     Dr. Rolle, an African American man, belongs to a protected class as contemplated by Title VII.

82.     Dr. Rolle was denied equal terms, conditions, benefits, or privileges of employment because of his race. Specifically, RMG demonstrated racial animus towards Dr. Rolle as evidenced by Dr. Rowland's admittedly racist and offensive comments to Dr. Rolle and RMG's failure to respond to Dr. Rolle's concerns regarding RMG's deviation from recognized standards of care for reasons, in part, related to his race.

83.     Dr. Rolle was further discriminated against because of his race when his contract was terminated without cause.

84.     Any proffered reason for Dr. Rolle's termination is only pretext.

85.     Dr. Rolle was treated differently, and worse, than several similarly situated non-African American employees.

86.     Dr. Rolle's race was the motivating factor in RMG's adverse employment actions.

11

87.     RMG's actions were willful, intentional, and done maliciously with callous disregard or reckless indifference to Dr. Rolle's federally protected rights. Exemplary damages are warranted to prevent similar unlawful conduct.

88.     Dr. Rolle was and continues to be damaged by the discriminatory conduct.

## COUNT III:
## RACE DISCRIMINATION IN VIOLATION OF THE ILLINOIS HUMAN RIGHTS ACT
### (against Defendant RMG)

89.     Plaintiff realleges and incorporates by reference all the allegations above as though fully stated herein.

90.     The IHRA prohibits the discrimination of any individual because of his race in connection with employment. 775 ILCS 5/101, *et seq.*

91.     RMG subjected Dr. Rolle to unequal treatment based on his race in connection with his employment. Specifically, RMG demonstrated racial animus towards Dr. Rolle as evidenced by Dr. Rowland's admitted comments to Dr. Rolle and RMG's failure to respond to Dr. Rolle's concerns regarding RMG's deviation from recognized standards of care.

92.     Dr. Rolle was further discriminated against because of his race when his contract was terminated without cause.

93.     Any proffered reason for Dr. Rolle's termination is only pretext.

94.     Dr. Rolle was treated differently, and worse, than several similarly situated non-African American employees.

95.     Dr. Rolle's race was the motivating factor in RMG's adverse employment actions.

96.     The actions in intentionally subjecting Dr. Rolle to adverse terms and conditions of employment because of his race have caused and are continuing to cause damages.

**COUNT IV:**
**BREACH OF CONTRACT**
**(against Defendant RMG)**

97.     Plaintiff realleges and incorporates by reference all the allegations above as though fully stated herein.

98.     Dr. Rolle and RMG entered into an Employment Agreement whereby RMG agreed to pay Dr. Rolle a base salary, plus incentive compensation. Ex. A.

99.     Dr. Rolle and RMG also entered in a TSCS Agreement whereby RMG agreed to pay Dr. Rolle for every day worked. Ex. B.

100.    Dr. Rolle performed under both agreements.

101.    Under Dr. Rolle's Employment Agreement and TSCS Agreement, he is entitled to monthly compensation for 90 days after his date of termination, February 1, 2021.

102.    Defendant inexcusably delayed Dr. Rolle's compensation for work performed in March and April 2021.

103.    Defendant refused to pay Dr. Rolle's earned incentive compensation or ATLS certification expenses.

**COUNT V:**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**(against Defendant RMG)**

104.    Dr. Rolle realleges and incorporates by reference all the allegations above as though fully stated herein.

105.    Dr. Rolle worked for RMG from December 3, 2019, until February 1, 2021.

106.    Dr. Rolle signed an Employment Agreement for a term of 36 months, to end in August 2022.

107.    Dr. Rolle performed all of his obligations under the Employment Agreement.

13

108.    Dr. Rolle's Employment Agreement was a contract and was, thus, governed by the implied covenant of good faith and fair dealing.

109.    Dr. Rolle refused to participate in activity that would result in a violation of his Employment Agreement's requirement that he behave in a manner that is "consistent with the applicable standard of care" and "professional, appropriate, and conducive to effective and efficient patient care." Ex. A §§ 1(m), (d).

110.    RMG used the "without cause" clause of Dr. Rolle's Employment Agreement as a pretext to unlawfully terminate him in retaliation for his refusal to participate in dangerous behavior contrary to public policy.

111.    RMG utilized its contractual discretion to deprive Dr. Rolle of the reasonable expectations of his Employment Agreement, including that he not be terminated for retaliatory reasons.

112.    As a result of Defendant's violation, Dr. Rolle lost his job and was unable to gain reemployment for several months.

113.    His reputation has also suffered irreparable damage, making it even more difficult for him to find gainful employment.

**COUNT VI:**
**VIOLATION OF THE IWPCA (820 ILCS 115)**
**(against all Defendants)**

114.    Dr. Rolle realleges and incorporates by reference all the allegations above as though fully stated herein.

115.    At all relevant times herein, the IWPCA was in effect.

116.    At all relevant times, Dr. Rolle was an employee within the meaning of the IWPCA.

117.    At all relevant times, all Defendants were employers within the meaning of the IWPCA.

118.    Defendants failed to pay Dr. Rolle on a monthly or semi-monthly basis for February, March, and April 2021, in violation of Section 3 of the Act.

119.    Defendants refused to compensate Dr. Rolle for his earned incentive compensation, in violation of Sections 4 and 5 of the Act.

120.    Defendants refused to reimburse Dr. Rolle for his ATLS certification expenses, in violation of Section 9.5 of the Act.

121.    The IWPCA mandates that Defendants pay Dr. Rolle all compensation due under the terms of his Employment Agreement.

122.    Defendant Benoit is individually liable for failure to pay Dr. Rolle because he, as an officer or agent of RMG, knowingly permitted RMG to violate the IWPCA. *See* 820 ILCS § 115/13.

123.    Defendant Kambic is individually liable for failure to pay Dr. Rolle because he, as an officer or agent of RMG, knowingly permitted RMG to violate the IWPCA. *See* 820 ILCS § 115/13.

124.    Defendants have knowingly and unlawfully refused to pay Dr. Rolle his earned wages and final compensation in violation of the IWPCA.

125.    As a direct and proximate result of Defendants' violation, Dr. Rolle has suffered and will continue to suffer lost wages and other damages.

126.    Defendants are liable for Dr. Rolle's unpaid wages in an amount to be determined at trial, in addition to statutory prejudgment interest. 820 ILCS 115/14.

**COUNT VII:**
**VIOLATION OF THE ILLINOIS WHISTLEBLOWER ACT (740 ILCS 174)**
**(against Defendant RMG)**

127.    Dr. Rolle realleges and incorporates by reference all the allegations above as though fully stated herein.

128.    Dr. Rolle refused to provide wound care to patients due to his concern that his lack of proper certification and lack of certified wound care nursing staff would endanger patient health and violate accepted standards of care, including those established by CMS, and would be detrimental to his ability to execute adequate patient care under his existing contracts.

129.    Dr. Rolle had previously, on a number of occasions, expressed similar concerns regarding violations of standards of care at RMG, including at a January 2021 morbidity and mortality meeting.

130.    On February 1, 2021, just 11 days after Dr. Rolle refused to provide wound care that could compromise his patients and violate CMS and IDPH regulations, RMG terminated his employment.

131.    The Illinois Whistleblower Act ("IWA") prohibits employers from retaliating against any employee "for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation…" 740 ILCS 174/20.

132.    RMG terminated Dr. Rolle's employment in retaliation for repeatedly expressing his concerns about RMG's failures to maintain accepted standards of care, including those mandated by CMS and the IDPH, for ordering unnecessary tests to defraud the government, and for his refusal to provide care that could compromise patient outcomes, in violation of the Illinois Whistleblower Act.

133.    As a direct and proximate result of RMG's violation, Dr. Rolle suffered injury for which he is entitled to relief.

### COUNT VIII:
### <u>RETALIATORY DISCHARGE</u>
### (against Defendant RMG)

134.    Dr. Rolle realleges and incorporates by reference all the allegations above as though fully stated herein.

135.    On or about January 20, 2021, Dr. Rolle refused to provide substandard wound care to patients due to his concern that his lack of proper certification as well as lack of proper wound care certification of Miller's involved wound care nursing staff would endanger patients and violate accepted standards of care.

136.    Dr. Rolle had previously, on a number of occasions, expressed similar concerns regarding violations of standards of care at RMG.

137.    Eleven days after Dr. Rolle refused the wound care assignment, RMG terminated Dr. Rolle's employment.

138.    The State of Illinois prohibits terminating an employee in retaliation for exercising or availing oneself of a public policy.

139.    The Illinois Medical Practice Act states: "Because the candid and conscientious evaluation of clinical practices is essential to the provision of adequate health care, it is the policy of this State to encourage peer review by health care providers." 225 ILCS 60/5.

140.    The IWA prohibits employers from retaliating against employees who refuse to participate in any activity that would violate state or federal law. 740 ILCS 174/20.

141.    Dr. Rolle invoked state and federal public policy when he repeatedly expressed his concerns about RMG's failure to maintain accepted standards of care, RMG's ordering of

unnecessary nuclear scans and painful peri-areolar injections, RMG's failure to evaluate clinical practices, and to provide adequate health care to patients.

142.    RMG terminated Dr. Rolle in retaliation for refusing to provide substandard medical care to Medicare and Medicaid patients, for refusing to order unnecessary tests that defrauded the federal government and caused pain to patients, for requesting root-cause analysis of patient deaths/unanticipated events, and for questioning why RMG was inadequately staffing its ICU.

143.    As a direct and proximate result of RMG's tortious retaliatory discharge, Dr. Rolle suffered injuries including lost wages, benefits, harm to professional standing and reputation, and emotional distress.

144.    Defendant's wrongful conduct was malicious and willful in that Defendant knew, or should have known, of the tortious nature of retaliatory discharge.

145.    Defendant further retaliated against Dr. Rolle by refusing to supply the requisite references and verifications to potential employers, thereby preventing Dr. Rolle from attaining gainful employment.

## COUNT IX:
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (against Defendant RMG)

146.    Dr. Rolle realleges and incorporates by reference all the allegations above as though fully stated herein.

147.    Dr. Rolle had a valid business expectancy with Ingalls Memorial Hospital.

148.    RMG knew about that valid business expectancy because it was asked to provide verification of Dr. Rolle's employment and references.

149.    RMG intentionally did not provide those verifications and references to Ingalls Memorial Hospital on Dr. Rolle's behalf.

150.    As a result of RMG's withholding, Ingalls canceled the assignment for Dr. Rolle.

151.    RMG intentionally withheld Dr. Rolle's references and verifications from other prospective employers so as to injure Dr. Rolle's prospective economic advantages.

## PRAYER FOR RELIEF

152.    WHEREFORE, Plaintiff, Dr. Rolle, respectfully requests that this Court enter judgment in his favor and against Defendants as follows:

a. Find that RMG violated Section 1981, Title VII, the IHRA, the IWA, breached Plaintiff's Employment Agreement and TSCS Agreement by failing to compensate Plaintiff under the terms of his contracts; and breached the covenant of good faith and fair dealing by unlawfully terminating Plaintiff's employment;

b. Find that RMG's termination of Plaintiff's employment was a retaliatory discharge in violation of a public policy;

c. Find that Defendants RMG, Benoit, and Kambic violated the IWPCA by refusing to pay Plaintiff his full compensation in a timely manner;

d. Find that Defendant RMG's conduct was willful;

e. Find that Defendant Benoit's conduct was willful;

f. Find that Defendant Kambic's conduct was willful;

g. Award Plaintiff all remedies under Section 1981, including reinstatement and/or other appropriate equitable relief, including all lost wages and other benefits; lost future earnings; compensatory damages; exemplary damages; and pre-judgment interest on the above damages;

h.  Award Plaintiff all remedies under Title VII and the IHRA, including monetary damages; front and back pay; exemplary damages; lost benefits; and emotional distress damages; and interest thereon;

i.  Award Plaintiff all remedies under the IWPCA, including compensatory damages, lost wages, statutory penalties and interest thereon;

j.  Award Plaintiff damages in an amount equal to the wages due under the contracts;

k.  Award Plaintiff his reasonable attorneys' fees, costs, and litigation expenses;

153.  Grant such other and further or different relief as the Court may deem just and proper.

## JURY DEMAND

154.  Dr. Rolle respectfully demands a trial by jury of all issues raised in this Complaint.

Dated: September 1, 2022                    Respectfully submitted,

                                           QUANTEL ROLLE

                                      By:  /s/      Kristen E. Prinz
                                           One of Plaintiff's Attorneys

The Prinz Law Firm, P.C.
Kristen E. Prinz (kprinz@prinz-lawfirm.com)
Christina Hynes-Mesco (cmesco@prinz-lawfirm.com)
Laura Lefkow-Hynes (llefkowhynes@prinz-lawfirm.com)
One East Wacker Drive, Suite 2500
Chicago, Illinois 60601
P: (312) 212-4450
F: (312) 284-4822
Firm ID: 46338

## **SERVICE LIST**

Joan E. Casciari
Seyfarth Shaw LLP
233 S. Wacker Drive, Suite 8000
Chicago, IL 60606
Tel. (312) 460-5862
Cell (847) 722-2586

Attorney for Defendant RMG